**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PAUL BUSER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRIZETTO PROVIDER SOLUTIONS LLC and COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION,<br><br>Defendants. | Case No.: ____________________<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## CLASS ACTON COMPLAINT

Plaintiff Paul Buser ("Plaintiff"), by and through her undersigned counsel, bring this Class Action Complaint on behalf of himself and all others similarly situated (the "Class") against Defendants TriZetto Provider Solutions LLC and Cognizant Technology Solutions Corporation, ("Cognizant"), (collectively, "Defendants"). Except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge, the following allegations are made upon information and belief, including investigation conducted by counsel.

## NATURE OF THE ACTION

1. This action arises from a significant hub-and-spoke data breach that exposed the personally identifiable information ("PII") and protected health information ("PHI") of thousands if not millions of individuals (collectively, "Private Information"). The breach resulted from Defendants' failure to implement adequate data security measures and provide timely notification to affected individuals.

2. TriZetto is a Delaware limited liability company based in Earth City, Missouri that

provides revenue management services to physicians, hospitals, and health systems.

3. Cognizant is a Delaware company based in Teaneck, New Jersey and is one of the world's leading professional services companies.[1] TriZetto is a wholly-owned subsidiary of Cognizant.[2]

4. To provide its services, TriZetto collects, processes, and stores Plaintiff's and Class Members' Private Information. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, TriZetto assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. By voluntarily undertaking the collection of this sensitive Private Information, TriZetto assumed a duty to use due care to protect that information.

5. Despite its duties to Plaintiff and Class Members, upon information and belief TriZetto stored their Private Information on a database that was negligently and/or recklessly configured. This misconfiguration allowed files on the database to be accessed without a password or any form of multifactor authentication.

6. Between November, 2024, and October 2, 2025, a threat actor infiltrated TriZetto's network, and accessed and exfiltrated confidential files including certain historical eligibility transaction reports stored within TriZetto's system (the "Data Breach"). The compromised information includes: names, addresses, dates of birth, Social Security numbers, health insurance member number (which may include Medicare Beneficiary Identifiers), health insurer name, primary insured or dependent information, other demographic, health or health insurance details. TriZetto reportedly detected the breach on October 2, 2025, after it identified suspicious activity

[1] https://d18rn0p25nwr6d.cloudfront.net/CIK-0001058290/ff38b94d-6a2b-4161-80e5-2fc623d02c7b.pdf
[2] https://www.trizettoprovider.com/who-we-are/our-story

within a web portal used by some of TriZetto's customers. TriZetto began providing notice to its direct clients in at least December 2025, two months after it detected the breach.

7. From the public disclosures to date, TriZetto failed to detect the Data Breach for over 11 months. Indicating that Defendant failed to adequately protect its systems, failed to have adequate monitoring in place, and did not have any effective means to prevent, detect, stop, or mitigate breaches of its systems.

8. TriZetto's shortcomings exposed the Class Members' Private Information to unnecessary risk.

9. TriZetto's failure to timely detect and report the Data Breach compounded the harm of the Data Breach by leaving victims vulnerable and completely unprotected from identity theft. Victims were not warned to monitor their financial accounts, credit reports, insurance or medical records to prevent unauthorized use of their Private Information.

10. TriZetto did not begin providing substantive notice to its clients and regulators until December, 2025—more than 2 months after detection, and more than an entire year after the beginning of the Data Breach.[3] On information and belief, notice still has not gone out to the victims of the Data Breach.

11. The exact nature and extent of the Data Breach is unknown, and such information is within the exclusive possession and control of TriZetto.

12. To date TriZetto has publicly disclosed that there are 3,433,965 victims of the Data Breach.

13. As a result of TriZetto's failure to protect the sensitive information it was entrusted to safeguard, Plaintiff and Class Members have already suffered harm and have been exposed to a

[3] https://www.classaction.org/media/trizetto-data-breach-attorney-letter-2025.pdf

significant and continuing risk of identity theft, financial fraud, and other identity-related fraud for years to come.

**PARTIES**

14. Plaintiff Paul Buser is an adult, who at all relevant times, is and was a citizen of the State of Massachusetts. Plaintiff Buser is a customer or client of one of TriZetto's customers.

15. Defendant TriZetto Provider Solutions LLC is a Delaware limited liability company with its principal place of business at 3300 Rider Trail S., Earth City, Missouri 63045.

16. Defendant Cognizant Technology Solutions Corporation is a Delaware company with its principal place of business at 300 Frank W. Burr Blvd., Teaneck, New Jersey 07666.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because Plaintiff and at least one member of the proposed Class are citizens of a state different from at least one Defendant,[4] the proposed Class consists of more than 100 members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18. This Court has general personal jurisdiction over Cognizant, was, at all relevant times, Cognizant was headquartered in New Jersey, has engaged in substantial business activities in New Jersey, regularly conducts business in New Jersey, and has sufficient minimum contacts in New Jersey.

19. This Court has specific personal jurisdiction over TriZetto because it conducts substantial business with entities located in New Jersey, is a subsidiary of a New Jersey company,

---

[4] *See* 28 U.S.C. § 1332(d)(10) (stating that for purposes of CAFA jurisdiction, an unincorporated association is deemed to be citizen of State where it has its principal place of business and under whose laws it is organized).

and on information and belief utilizes the services of its New Jersey parent to conduct its business. Plaintiff's claims arise directly from that relationship and the Data Breach. TriZetto purposefully availed itself of the privilege of conducting business in New Jersey by seeking and engaging with New Jersey based companies.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District. Defendants conduct substantial business in this District, and the Data Breach has caused harm to Plaintiff and Class Members residing in this District.

## FACTUAL BACKGROUND

### A. Defendants Collected, Stored, and Failed to Safeguard Plaintiff's and Class Members' PII.

21. TriZetto lists itself on its website as "a Cognizant company."[5] It was acquired by Cognizant in 2014.[6] Both the Privacy Notice and Terms and Conditions hyperlinks on TriZetto's website link to Cognizant websites.[7]

22. TriZetto advertises that it provides "simplify the business of healthcare. By combining intuitive products and customer-focused services with in-depth industry knowledge, we provided complete revenue cycle management services to empower our clients to succeed."[8] According to its website covers over 875,000 providers, has 650 PMS/HER integrations, 11,000 payer connections, and over 4 billion transactions annually.[9]

23. In its ordinary course of business, TriZetto obtains, stores, maintains, and uses

[5] https://www.trizettoprovider.com/
[6] https://www.trizettoprovider.com/who-we-are/our-story
[7] https://www.cognizant.com/us/en/terms-conditions
[8] https://www.trizettoprovider.com/who-we-are/our-story
[9] https://www.trizettoprovider.com/

Plaintiff's and Class Members' Private Information.

24. Defendants agreed to and undertook legal duties to maintain the Private Information of Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws and regulations.

25. In the course of providing health care services TriZetto's clients collect and maintain large volumes of sensitive personal and medical information from their patients and members, including names, dates of birth, Social Security numbers, insurance identification numbers, claims data and information, and other personally identifiable and protected health information.

26. Plaintiff and Class Members entrusted their healthcare providers and other clients of TriZetto with their PII and PHI in order to receive healthcare and health insurance services and reasonably expected that it would be kept secure and confidential.

27. TriZetto explicitly acknowledges its duty to protect the privacy of members' health information. In its *Privacy Notice* TriZetto says "Cognizant Technology Solutions Corporation and its affiliated companies ('Cognizant' 'we' or 'us') are firmly committed to protecting your privacy."[10]

28. In the same *Privacy Notice* TriZetto makes additional representations such as:

(1) that they will only "share your personal information with other third parties when you separately consent to such sharing."

(2) "Your personal information will be retained only for so long as reasonably necessary for the purposes set out in this Privacy Notice in accordance with

[10] https://www.cognizant.com/us/en/privacy-notice. The privacy notice is hosted and updated by Cognizant but is linked from TriZetto's website and applies to TriZetto.

applicable laws, including for the purposes of satisfying any legal, regulatory, accounting or reporting requirements."

(3) "[TriZetto] implements appropriate security measures designed to prevent unlawful or unauthorized processing of personal information and accidental loss of or damage to personal information."[11]

29. Cognizant maintains a *Code of Ethics* that "applies to all Cognizant directors, officers, and employees worldwide as well as all Cognizant business units, subsidiaries, and joint ventures over which Cognizant has operational control (collectively 'associates')."[12] In that *Code of Ethics*, Cognizant represents that it "follow[s] all applicable laws in the countries in which we do business. We never cut corners or bend the rules."[13] And that its "commitment to doing business ethically includes respecting privacy, protecting information, and safeguarding assets."[14] The *Code of Ethics* further states the following:

(1) "One way we distinguish ourselves in the market is by maintaining the highest standards of integrity."

(2) "Our commitment to doing business ethically includes respecting privacy, protecting information, and safeguarding assets."

(3) "We respect and protect the confidential and personal information we hold on behalf of our clients, our associates, and third parties. We collect and handle confidential and personal information in accordance with applicable laws and take measures to maintain it securely in accordance with our corporate policies."

---

[11] https://www.cognizant.com/us/en/privacy-notice
[12] https://www.cognizant.com/en_us/about/documents/code-of-ethics.pdf
[13] https://www.cognizant.com/en_us/about/documents/code-of-ethics.pdf
[14] https://www.cognizant.com/en_us/about/documents/code-of-ethics.pdf

(4) "We safeguard company and client assets from misuse, abuse, and unauthorized disclosure and theft."

30. Cognizant maintains a "Cybersecurity" page on their website that states "Cybersecurity is the combination of strategies, technologies, processes and practices designed to protect an enterprise from damage, disruption or theft due to malicious electronic attack or unauthorized access to data, systems and/or applications. … The business benefits of cybersecurity include: Protecting data from theft, disruption and misuse."[15]

31. Cognizant also maintains a Cybersecurity Services webpage.[16] Where Cognizant says "In today's digital landscape, cybersecurity has become a top priority. To safeguard business stakeholders and stay complaint with regulations, organizations need to enforce stringent information security controls and privacy measures. … To stay compliant and mitigate risks effectively, progressive enterprises need modular, scalable and adaptive cybersecurity solutions." Cognizant further represents:

(1) "Data is an enterprise's foundation for resilience and trust. Cognizant data protection and privacy services safeguard sensitive information and ensure compliance with privacy regulations. … Our database security and activity monitoring provide continuous protection. Additionally, our data privacy platform services and consent management ensure responsible data handling and compliance with global laws, creating a holistic approach to data security and privacy."

32. TriZetto maintains a "Cybersecurity Best Practices" webpage.[17] On this webpage

[15] https://www.cognizant.com/us/en/glossary/cyber-security
[16] https://www.cognizant.com/us/en/services/cybersecurity-services
[17] https://www.trizettoprovider.com/cybersecurity-best-practices

TriZetto discusses best practices that help protect organizations from cybercrime. These best practices include:

(1) "Have up-to-date antivirus software protecting your device(s) and content"

(2) "Ensure applications and operating systems are up to date"

(3) "Use strong passwords to prevent hackers from gaining access to your accounts"

(4) "Have a strategy in place so employees know what to do and who to contact when they see suspicious activity or believe they have been a victim of a cyberattack."

33. Plaintiff alleges that TriZetto accessed, used, and maintained PHI and PII on behalf of One Community and was therefore a Business Associate subject to the obligations imposed by HIPAA and One Community's internal policies. As such, TriZetto was required to comply with HIPAA, enter into a Business Associate Agreement, and implement appropriate privacy and security safeguards.

34. TriZetto, failed to comply with the privacy, security, and operational requirements imposed by HIPAA, industry standards, and its contractual obligations as a Business Associate.

35. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

36. Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this Private Information.

22. Plaintiff and Class Members directly or indirectly entrusted Defendants with sensitive and confidential information, including their Private Information which includes

information that is static, meaning it does not change, and can be used to commit myriad financial crimes.

23. TriZetto did not implement reasonable and appropriate administrative, technical, and physical safeguards to protect the sensitive data it received and maintained.

24. As a result of Defendants' failure to comply with their privacy and security obligations, Plaintiff's and Class Members' sensitive Private Information was accessed and stolen by cybercriminals.

**B. The Data Breach.**

26. On October 2, 2025, TriZetto discovered "suspicious activity within the web portal used by some of its healthcare provider customers to access their systems."[18] After investigating the suspicious activity, TriZetto determined that starting in November 2024, a threat actor "accessed certain historical eligibility transaction reports stored within [TriZetto's] system. These reports included protected health information (PHI) for individuals…" The breached information included: name, address, date of birth, Social Security number, health insurance member number (which may include Medicare Beneficiary Identifiers), health insurer name, primary insured or dependent information, other demographic, health, or health insurance details. The specific details regarding the extent of the Data Breach are within the exclusive control of TriZetto.

27. TriZetto began providing notice to its healthcare customers on December 9, 2025.

28. Because TriZetto failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access TriZetto's systems and exfiltrate Private Information.

---

[18] https://www.ag.idaho.gov/content/uploads/2025/12/2025-12-11-South-Central-Public-Health-District.pdf

**C. The Data Breach was Foreseeable and Preventable.**

29. Organizations operating in the healthcare, health-related, and financial sectors have long been recognized as high-value targets for cybercriminals. These entities collect and store vast amounts of sensitive information—including patients' financial data, login credentials, insurance details, medical records, diagnoses, and employees' personal information—all of which command high prices on underground markets.

30. In response to growing cybersecurity threats, the Federal Bureau of Investigation ("FBI"), the Cybersecurity and Infrastructure Security Agency ("CISA"), and the U.S. Department of Health and Human Services ("HHS") issued a Joint Cybersecurity Advisory in October 2020 warning U.S. healthcare entities of a "credible and imminent cybercrime threat" and urging immediate implementation of robust, layered security defenses.[19]

31. In 2016, the Homeland Security Advisor Council (HSAC) warned that the Financial Services sector faced rapidly growing cyber threats.[20] The chair of the Securities and Exchange Commission (SEC) warned that cybersecurity was the biggest risk to the financial system.[21] The following year, in 2017, the National Infrastructure Advisory Council (NIAC) issued a report titled "Addressing Urgent Cyber Threats to Critical Infrastructure," advising that "[t]oday's cyber attacks are increasingly dangerous and targeted, designed by advanced actors to damage or disrupt

---

[19] Joint Cybersecurity Advisory, *Ransomware Activity Targeting the Healthcare and Public Health Sector* (October 28, 2020), https://www.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf.

[20] HSAC, Final Report of the Cybersecurity Subcommittee: Part I-Incident Response, 2016. https://www.dhs.gov/sites/default/files/publications/HSAC_Cybersecurity_IR_FINAL_Report.pdf

[21] Lisa Lambert and Suzanne Barlyn, SEC says cyber security biggest risk to financial system, REUTERS (May 18, 2016), available at https://www.reuters.com/article/us-finance-summit-sec-idUSKCN0Y82K4/.

critical U.S. infrastructure that deliver vital services—particularly…financial services."[22] According to a 2019 Identity Theft Resource Center and CyberScout Annual End-of-Year Data Breach Report, of the 1,473 recorded data breaches, 108 of them were in the financial services sector, responsible for 62% of the 164 million sensitive records exposed in 2019.[23]

32. Data breaches and identity theft have surged in recent years, creating growing economic consequences for individuals, businesses, and government entities. In 2023 alone, there were 6,077 recorded breaches exposing more than 17 billion records—representing a 19.8% year-over-year increase in the United States compared to 2022.[24] This trend is mirrored in identity theft complaints, which nearly doubled over a four-year span—from 2.9 million reports in 2017 to 5.7 million in 2021.[25]

33. In March 2022, Bloomberg described the financial services industry as experiencing an "unrelenting year of fighting off cyber threats," and warned financial services providers "should expect more of the same or even worse."[26] As noted in the article, the Financial

---

[22] Securing Cyber Assets: Addressing Urgent Cyber Threats to Critical Infrastructure, THE PRESIDENT'S NATIONAL INFRASTRUCTURE ADVISORY COUNCIL (Aug. 2017), available at https://www.cisa.gov/sites/default/files/publications/niac-securing-cyber-assets-final-report-508.pdf

[23] 2019 End-of-Year Data Breach Report, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/wpcontent/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-BreachReport_FINAL_Highres-Appendix.pdf; 62% of breached data came from financial services in 2019, CIO DIVE (Dec. 23, 2019), available at https://www.ciodive.com/news/62-of-breached-data-came-from-financial-servicesin-2019/569592/; Bitglass' 2019 Financial Breach Report, BITGLASS.

[24] Flashpoint, *2024 Global Threat Intelligence Report*, (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[25] Insurance Information Institute, *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports, %202015-2019%20.

[26] Financial Firms Brace for More Cyber Threats After Trying 2021, BLOOMBERG (March 10, 2022), https://www.bloomberg.com/news/articles/2022-03-10/financial-firms-poised-for-worse-cyber-threats-after-trying-year

Services Information Sharing and Analysis Center's ("FS-ISAC") annual report on cyber threats predicted "current trends to continue and possible worsen over the next year," stating cybersecurity is "no longer just a back-office cost." These increases are "due to several factors," including the "rapid digitization of financial services, which accelerated during the pandemic," and "increased entry points for cyber criminals to possibly exploit." Teresa Walsh, who leads FS-ISAC's global intelligence office, described the financial sector as experiencing "a dizzying number of vulnerabilities."

34. In a ruling that took effect in May 2022, the Federal Deposit Insurance Corp. (FDIC), the Office of the Comptroller of the Currency (OCC), and the Federal Reserve (together, the "agencies") now require banks to notify their primary federal regulator within 36 hours of determining whether a "significant computer-security incident" could disrupt business or the stability of the financial sector, and requires banks to inform affected bank customers "as soon as possible," recognizing cyberattacks targeting the financial services industry "have increased in frequency and severity in recent years."[27]

35. Recent statistics confirm that data breaches concerning medical records and/or healthcare have been on a steady upward trend for over a decade. According to the *HIPAA Journal*, these incidents have increasingly involved millions of affected patients.[28] High-profile breaches at healthcare providers and related service companies in recent years include: Change Healthcare,

---

[27] Fed, FDIC, OCC approve 36-hour window for reporting cyberattacks, BANKING DIVE (Nov. 19, 2021), available at https://www.bankingdive.com/news/36-hour-window-fed-fdic-occ-cybersecuritytechnology-vendor/592275/; FEDERAL RESERVE, Computer-Security Incident Notification Requirements for Banking Organizations and Their Bank Service Providers (April 1, 2022), available at https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20211118a1.pdf.

[28] The HIPAA Journal, *Healthcare Data Breach Statistics* (October 26, 2025), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

Inc. (affecting 190 million individuals in 2024);[29] Anthem, Inc. (affecting 78.8 million individuals in 2015); American Medical Collection Agency (affecting more than twenty-six million individuals in 2019); Welltok, Inc. (affecting 14.7 million individuals in 2023); Premera Blue Cross (affecting eleven million individuals in 2015); CareSource (affecting more than three million individuals in 2023); Perry Johnson & Associates, Inc. (affecting 9.3 million people in 2023); Excellus Health Plan, Inc. (affecting ten million individuals in 2015); and many more.[30]

36. Consequently, TriZetto should have known of the importance of safeguarding the Private Information and of the foreseeable consequences that would occur if its data security system was breached, including the significant costs that would be imposed on victims as a result of a breach.

37. Despite all of the publicly available knowledge of the continued risks to client Private Information, and despite holding Private Information of millions of its clients' patients, TriZetto failed to use reasonable care in maintaining the privacy and security of the Private Information of Plaintiff and Class Members.

38. Had TriZetto implemented industry standard security measures and adequately invested in data security, unauthorized parties likely would not have been able to access TriZetto's systems and the Data Breach would have been prevented or much smaller in scope.

**D. Defendants are Subject to and Failed to Comply with HIPAA.**

39. HIPAA establishes security provisions and data privacy responsibilities designed to keep individuals' medical information safe. HIPAA compliance provisions, commonly known

---

[29] A breach TriZetto was very aware of as it posted a FAQ document about the breach to its website. https://www.trizettoprovider.com/wp-content/uploads/2024/04/2024-04-25-Change-FAQ-Document.pdf

[30] *Id.*

as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[31]

40. HIPAA requires the implementation of comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI.[32]

41. HIPAA applies to two types of entities: "covered entities," such as healthcare providers, health plans, or healthcare clearinghouses; and "business associates," who are contracted by covered entities to assist in performing healthcare-related functions. *See* 45 C.F.R. § 160.103.

42. Upon information and belief, TriZetto is a "business associate" subject to HIPAA because it receives, maintains, and electronically transmits PHI from health plans and insurance companies. TriZetto represents that it serves over 875,000 providers.[33]

43. These providers, including One Community are "covered entities" under HIPAA.

44. Upon information and belief, TriZetto entered into a Business Associate Agreement ("BAA") with One Community.

45. TriZetto maintains a form BAA on its website.[34] One of the obligations of TriZetto under the form BAA is: "Uses and Disclosures of PHI. TriZetto shall not use or disclose PHI other than as permitted or required by the Services Agreement or as required by law." TriZetto is also obligated to "use reasonable and appropriate safeguards in compliance with Subpart C of 45 C.F.R.

---

[31] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[32] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

[33] https://www.trizettoprovider.com/

[34] https://www.trizettoprovider.com/wp-content/uploads/BAA-05232017.pdf

Part 164 with respect to PHI in electronic format designed to prevent use or disclosure of PHI other than as provided for by this BAA."

46. TriZetto maintains a form General Terms contract on its website.[35] In this contract TriZetto agrees to "use reasonable and appropriate safeguards as described in the business associate agreement." TriZetto also represents and warranties that it will "us[e] commercially reasonable care and skill in conformance in all material respects with the Agreement and any applicable SOW."

47. HIPAA requires Defendants to implement adequate safeguards to prevent the unauthorized use or disclosure of PHI, including compliance with the HIPAA Security Rule.[36] It is also obligated to report any unauthorized access or disclosure of PHI, including incidents involving breaches of unsecured PHI—such as the Data Breach at issue in this case.[37]

48. These requirements include: (a) ensuring the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identifying and protecting against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protecting against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensuring compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.; *see also* 45 C.F.R. § 164.308 (administrative safeguards).

49. The Department of Health and Human Services Office for Civil Rights recommends the following data security measures that covered entities and business associates

---

[35] https://www.trizettoprovider.com/wp-content/uploads/GeneralTerms05232017.pdf

[36] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[37] *See* Breach Notification Rule, 45 C.F.R. §§ 164.400–414.

like Defendants should implement to protect against common cyber-attack techniques:

(1) Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

(2) Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious sites, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

(3) Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

(4) Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

(5) Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[38]

50. Due to the nature of their businesses, Defendants cannot conduct regular operations without collecting and maintaining individuals' PHI—information it knows to be highly sensitive and confidential.

51. Despite their duty to safeguard Plaintiff's and Class Members' PHI and other Private Information, Defendants failed to employ adequate data security measures, including some or all of the measures set forth above. As a result, highly sensitive and confidential information was exposed in the Data Breach.

**E. Defendants Failed to Comply with FTC Guidelines.**

---

[38] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dep't Health & Human Services, (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

52. Defendants are prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

53. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[39]

54. In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[40] The guidelines recommend that businesses implement the following:

(1) Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

(2) Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

(3) Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

(4) Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

(5) Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[41]

---

[39] *See* Federal Trade Commission, *Start with Security: A Guide for Business*, https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[40] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[41] *Id.*

55. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[42]

56. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

57. Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' Private Information constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

58. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use

[42] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

to evaluate and improve their information security controls.[43]

59. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[44] Upon information and belief, Defendants failed to adhere to the NIST guidance.

60. Defendants were well aware of their obligations to use reasonable measures to protect individuals' Private Information. Defendants also knew they were a target for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendants nevertheless failed to comply with their data security obligations, leading to the compromise of Plaintiff's and Class Members' Private Information.

**F. Defendants Knew the Risks of Storing Valuable Private Information.**

61. At all relevant times, Defendants were aware that the Private Information they collected, maintained, created, and exchanged was highly sensitive and of significant value to bad actors seeking to misuse it.

62. Defendants also knew that a breach of their systems—and the resulting exposure of the sensitive information stored therein—posed a serious risk of identity theft, financial fraud, and other harm to affected individuals.

63. In fact, TriZetto was aware of the risks it faced and even developed advertising materials based on those risks. In 2023 TriZetto published an article on its website titled "Safety

---

[43] National Institute of Standards and Technology*, Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[44] *Id.* at Table 2, 26-43.

First; Management Enrollments Properly through PECOS."[45] In this article TriZetto repeatedly uses cybersecurity risks as selling points for its products. "When it comes to sharing personal information, the rule of thumb is to keep the information, well, personal." "One industry where sharing personal information is frowned upon is healthcare. Not only does [HIPAA] ensure patient medical information stays private, but security guidelines, password requirements and consent forms addressing the transmission of patient-practice communications across various mediums are incorporated by medical practices, hospitals and health systems of all sizes. In today's age where phishing, hacking and other security threats are becoming more commonplace, it's more important than ever to utilize proper security-related protocols in all aspects of business." These statements make clear that TriZetto was well aware of the risks it faced in this sector.

(1) "TriZetto Provider Solutions manages client enrollments within the system, properly and securely. Our experts utilize their own login information, and our users have also completed two-part authentication, which requires phone or email verification to keep the account as secure as possible."

(2) "Just as HIPAA is critical to protecting the privacy and security of health information, using proper credentials and security best practices also is a necessity. When it comes to adhering to security best practices, unfortunately, not every company is following protocol. But here at TPS, we like to think of ourselves as being ahead of the curve."

64. TriZetto repeatedly uses the risky cybersecurity landscape as a marketing tool. In a flyer titled "Fast Track your Clearinghouse Enrollments" TriZetto advertises its security because "[w]e know data security is a high concern for our clients. That's why our clients put their trust in

[45] https://www.trizettoprovider.com/safety-first-managing-enrollments-properly-through-pecos

an EHNAC and SOC 2 certified partner that puts data protection as a top priority."[46]

65. In a 2022 article titled "Anesthesia Billing Software Services: Customer Data Protection Methodology" TriZetto discusses how it approaches data security and the importance of data security. "At TriZetto Provider Solutions, we understand that data security is an important issue for our SaaS platform clients. Protecting our clients' data in transmission and at rest remains one of our top priorities. We know how critical it is to keep protected healthcare information (PHI) secure and we continue to invest the effort and expense necessary to meet industry compliancy standards for data security."[47] In that same article TriZetto represents:

(1) "We take tremendous precautions when storing customer data. Data stored in plain text can be read by anyone who has access to that data. … We store all customer data in an encrypted format. … Only a customer with the proper key can access the encrypted data."

(2) "Despite all the security methods in place for data in a resting status, the data must also be encrypted while in transit. … Even if the data is intercepted by an unauthorized individual while in transit, it is still in an encrypted state. This helps prevent hackers from exploiting vulnerabilities in internet connections and stealing passwords, eavesdropping on patient information or collecting sensitive data."

66. In a flyer titled Product Solutions Overview posted to TriZetto's website, TriZetto represents that its Patient Financial solution "enable[s] our patient to make online payments with our easy-to-use patient payment portal. With 24/7 access and the highest levels of security, this

---

[46] https://www.trizettoprovider.com/wp-content/uploads/2024/03/Fast-Track-Clearinghouse-Enrollments-Fact-Sheet_03-2024-.pdf

[47] https://www.trizettoprovider.com/anesthesia-billing-software-services-customer-data-protection-methodology

online solution provides an easy, secure way to bill and collect payments from patients, reducing the time it takes to get paid. Advantages include accelerated collections, increased security and improved patient satisfaction."[48]

67. TriZetto's clients and victims came to and used TriZetto because it advertised itself as secure.

68. Private Information has considerable monetary value and is a well-known target for cybercriminals. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[49]

69. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, medical fraud, and more.

70. **Social Security numbers**: Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

71. The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

---

[48] https://www.trizettoprovider.com/wp-content/uploads/TPS-Solutions2020.pdf

[49] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[50]

72. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

73. **Health Insurance Information**: "Stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[51]

74. In fact, there are even guides, tutorials, and documentation available on the dark

---

[50] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[51] Forbes, *Why Cyber-Criminals Are Attacking Healthcare—And How To Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69.

web to assist novice cybercriminals in conducting health insurance fraud.[52]

75. This type of fraud, known as medical identity theft, can be hard to spot and even harder to recover from—"[t]he average person may have no idea a problem like this can arise until long after a theft occurs."[53]

76. As Eva Velasquez, president and CEO of the Identity Theft Resource Center, explains, a "majority of victims find out when they're trying to move on with their lives, if bills have gone to collections."[54] Additionally, as cybersecurity experts at the American Hospital Association have noted:

> [T]he personal information in people's medical records may be sold in bulk to criminals who create phony providers to submit fraudulent claims on a mass scale that can result in hundreds of millions of dollars in Medicaid, Medicare, or other insurance fraud. Or they may use the information to create fake identities to apply for loans, mortgages, or credit cards.[55]

77. Medical identity theft causes tens of billions of dollars in losses annually.[56]

78. According to a *Reuters* investigation based on interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data sold on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information."[57] Fraudsters commonly use this data "to create fake IDs to buy medical equipment

---

[52] Dark Owl, *Unveiling Insurance Fraud on the Dark Web* (Apr. 25, 2024), https://www.darkowl.com/blog-content/unveiling-insurance-fraud-on-the-dark-web/.

[53] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

[54] *Id.*

[55] *Id.*

[56] FBI, *Health Care Fraud*, https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud.

[57] Reuters, *Your Medical Record is Worth More to Hackers Than Your Credit Card* (Sept. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[58]

79. Tom Kellermann, chief cybersecurity officer at cybersecurity firm Carbon Black, explains: "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[59]

80. As noted by Paul Nadrag, a software developer at medical device integration firm Capsule Technologies, the high value of medical data stems from its permanence and range of sensitive details:

> The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[60]

81. Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[61] In some cases, victims may not even be able to access medical records

---

[58] *Id.*

[59] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[60] Fierce Healthcare, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[61] Ponemon Institute, *Fifth Annual Study on Medical Identity Theft* (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.

using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[62]

82. Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);
- Receive information from their health plan that they have reached their limit on benefits; or
- Be denied insurance because their medical records show a condition they do not have.[63]

83. Perhaps the most dangerous consequence of medical identity theft is the risk of misdiagnosis or improper treatment. Ann Patterson, a senior vice president of the Medical Identity Fraud Alliance, notes: "About 20 percent of victims have told us that they got the wrong diagnosis or treatment, or that their care was delayed because there was confusion about what was true in their records due to the identity theft."[64]

84. A Consumer Reports article titled "The Rise of Medical Identity Theft" describes

---

[62] *Id.*

[63] Federal Trade Commission, *Medical Identity theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf.

[64] Consumer Reports, *The Rise of Medical Identity Theft* (Aug. 25, 2016) https://www.consumerreports.org/health/medical-identity-theft-a1699327549/.

real-world consequences of this threat, noting that it "isn't a hypothetical problem," and warning that "long tail on medical identity theft can create havoc in victims' lives."[65] As one example, a pregnant woman reportedly used a victim's medical identity to pay for maternity care at a nearby hospital. When the infant was born with drugs in her system, the state threatened to take the *victim's* four children away—not realizing her identity had been stolen. The victim ultimately had to submit to a DNA test to remove her name from the infant's birth certificate, but it took years to get her medical records corrected.[66]

85. Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[67] Tom Kellermann notes: "Traditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[68] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

**G. Plaintiff and Class Members Suffered Damages.**

86. For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1)

---

[65] *Id*.

[66] *Id*.

[67] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[68] *Id*.

closely monitor their bills, records, medical statements, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

87. Once Private Information is exposed, there is virtually no way to recover the data or prevent future misuse. This is especially true here, where the information stolen during the Data Breach has been leaked on the dark web and remains available to download. As a result, Plaintiff and Class Members must maintain heightened vigilance indefinitely. Further, Plaintiff and Class Members have not been compensated for the unconsented and unauthorized disclosure of their Private Information, for which there is a robust market.

88. As a direct result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer economic and other concrete harms, including but not limited to:

(1) Unauthorized disclosure of their confidential information;

(2) Loss of the control of their Private Information;

(3) Loss of the benefit of their bargain in choosing organizations promising data protection;

(4) Loss of the value of access to their Private Information;

(5) Identity theft, fraud, and misuse of medical and financial information;

(6) Out-of-pocket expenses for credit monitoring, mitigation efforts, and fraud prevention tools;

(7) Unauthorized charges and restricted access to financial accounts;

(8) Emotional distress, anxiety, and loss of privacy;

(9) Time and productivity lost dealing with the consequences of the breach;

(10) Damage to credit scores, including from fraudulent inquiries; and

(11) Continued and imminent risk of future fraud and identity theft due to their data being in the hands of unauthorized third parties.

89. Individuals suffer harm each time their personal data is compromised and circulated on underground markets—even if they have been affected by prior breaches. The dark web contains vast, fragmented repositories of stolen information that can be aggregated by different criminals for varied forms of fraud. Each subsequent breach increases the likelihood that a victim's sensitive data will be accessed by more actors and exploited in new and damaging ways.

90. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes.

91. Plaintiff and Class Members place significant value on data security and consider a company's ability to protect personal information a key factor in their purchasing decisions. Many consumers are willing to pay more for services from organizations that demonstrate strong cybersecurity practices. Conversely, consumers are far less likely to share personal data with companies that have suffered a data breach—reflecting the reputational damage and business consequences that flow from failing to safeguard sensitive information. A fact TriZetto capitalizes on in its advertising.[69]

---

[69] https://www.trizettoprovider.com/revenue-cycle-outsourcing-intertwining-process-with-technology-to-improve-outcomes ("And speaking of platforms, one of the most important factors involving software center around security. A partner should have established digital safety measures in place.").

92. Because of the premium consumers place on data privacy, companies including companies in the healthcare sector with robust security practices are viewed more favorably and can command higher prices than those that do not. Had TriZetto's clients and clients' patients including Plaintiff known the truth about its lack of cybersecurity—or that it entrusted their sensitive data to an entity with inadequate security practices—they would not have used TriZetto's clients' services; paid less; complained to their providers; or otherwise sought alternative arrangements for services. As a result, Plaintiff and Class Members were deprived of the benefit of their bargain, having paid for secure and responsible handling of their Private Information but receiving substantially less in return.

93. By collecting and storing Plaintiff's and Class Members' sensitive information, Defendants undertook a duty to safeguard it and avoid increasing the risk of identity theft or fraud. Because Defendants failed to uphold that duty, Plaintiff seeks the present value of identity protection services and other compensatory measures to address the current and future harm stemming from the Data Breach.

94. Additionally, Plaintiff and Class Members are entitled to recover the reasonable use value of their Private Information that was accessed and exfiltrated without authorization. This form of compensation mirrors damages awarded in intellectual property cases for unauthorized use of intangible assets. As with a patent or trade secret, Private Information is non-rivalrous: their unauthorized use by a third party does not eliminate the owner's ability to use them but still justifies compensation based on market value.

95. TriZetto's delayed notice of the Data Breach caused additional harm to Plaintiff and Class Members. Victims have still not received formal notice. This lack of transparency has deprived victims of the ability to take timely, informed, and proactive measures to mitigate harm

caused by the Data Breach. Besides violating several breach notification laws, the failure to provide timely notice demonstrates that Defendants did not have adequate logging and monitoring to even understand the scope of the Data Breach.

96. Upon information and belief, Defendants continue to retain the Private Information of Plaintiff and all Class Members. As long as Defendants maintain possession of this information, Plaintiff and Class Members have a strong and ongoing interest in ensuring that adequate safeguards are in place to prevent further unauthorized access or disclosure.

**H. Plaintiff Paul Buser's Experience.**

97. As part of receiving healthcare services, Plaintiff Buser was required to provide and entrust his healthcare providers with his Private Information. In turn, his healthcare providers provided and entrusted his Private Information to TriZetto for services. When directly and/or indirectly providing and entrusting Defendants with his Private Information, Plaintiff Buser reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

98. Plaintiff Paul Buser received notice of the Data Breach in or around March 2026, informing him that his sensitive Private Information including "name, address, date of birth, health insurance member number (which, for some individuals, may be a Medicare beneficiary identifier), provider name, health insurer name, primary insured information, and other demographic, health, and health insurance information" was exposed in Defendants' Data Breach

99. The deficient notice provided by Defendants does not list which of Plaintiff Buser's healthcare providers used Defendants' services.

100. Defendants were in possession of Plaintiff Buser's Private Information before and during the Data Breach and continue to possess Plaintiff Buser's Private Information to the

present.

101. At the time of the Data Breach, Defendants retained Plaintiff Buser's Private Information on their network with inadequate data security and in unencrypted form, causing Plaintiff Buser's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

102. Plaintiff Buser reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Buser would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he knew that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

103. Plaintiff Buser greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Buser is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

104. As a direct and proximate result of the Data Breach that Defendants caused and allowed to occur, Plaintiff Buser has suffered, and will imminently suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Private Information itself.

105. As a result of the Data Breach, Plaintiff Buser has spent considerable time researching the Data Breach and other necessary mitigation efforts. This included his contacting the Defendant via their toll-free number--which connected him to Cognizant's customer service--to determine which of his healthcare provider(s) was involved in the breach; this resulted in his being told that this information could not be provided to him immediately, but someone would call him back that day; no one returned his call. Plaintiff Buser waited on hold and spent additional

time attempting to obtain information about the breach, but Defendants failed to provide the requested information or return his call. This is valuable time that Plaintiff Buser would have spent on other activities, including but not limited to work and/or recreation.

106. The Data Breach has caused Plaintiff Buser to suffer fear, anxiety, and stress regarding the disclosure of his Private Information in the Data Breach, which has been compounded by Defendants' delay in notifying him of the fact that his Private Information was acquired by criminals as a result of the Data Breach. Plaintiff Buser fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Private Information. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a data breach victim that is contemplated and addressed by law.

107. Plaintiff Buser suffered actual injury from having his PII and PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII and PHI; (iii) lost or diminished value of PII and PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII and PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII and PHI. The Private Information compromised in the Data Breach was accessed and exfiltrated by unauthorized cybercriminals, creating a substantial and ongoing risk of misuse.

108. As a result of the Data Breach, Plaintiff Buser faces a substantial, imminent, and ongoing risk of identity theft and fraud, as his Private Information compromised in the Data Breach includes sensitive data that cannot be changed.

109. Plaintiff Buser anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

110. Plaintiff Buser's sensitive Private Information remains in Defendants' possession without adequate protections against known threats, exposing Plaintiff Buser to the imminent prospect of additional harm. Thus, Plaintiff Buser has a continuing interest in ensuring that his Private Information is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

111. Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), as applicable, and/or (c)(4), Plaintiff seeks certification of the following nationwide class against TriZetto:

> Nationwide Class: All U.S. persons whose Private Information was compromised in the Data Breach.

112. Specifically excluded from the Class are Defendants and their officers, directors, or employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

113. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when they move for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

114. **Ascertainablity.** The members of the Class are readily identifiable and

ascertainable because the Class is defined based on objective criteria. Defendants and/or its affiliates, among others, possess the information to identify and contact Class Members.

115. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all of them is impracticable. Based on TriZetto's statements, the Class potentially contains thousands if not millions of individuals whose Private Information was compromised in the Data Breach.

116. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Class, Plaintiff's claims are typical of the claims of the members because all Class Members had their Private Information compromised in the Data Breach and were harmed as a result.

117. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and her interests are aligned with Class Members' interests. Plaintiff was subject to the same Data Breach as Class Members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases.

118. **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There are questions of law and fact common to the Class such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

(1) Whether Defendants owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information;

(2) Whether Defendants acted negligently in connection with the collection, storage, monitoring and/or protection of Plaintiff's and Class Members' Private Information;

(3) Whether Defendants breached their duties to implement reasonable security procedures to protect Plaintiff's and Class Members' Private Information;

(4) Whether Defendants' breaches of their duties to implement reasonable security procedures directly and/or proximately caused damages to Plaintiff and Class Members;

(5) Whether Defendants provided timely notice of the Data Breach to Plaintiff and Class Members; and

(6) Whether Plaintiff and Class Members are entitled to compensatory damages, statutory damages, punitive damages, and/or nominal damages as a result of the Data Breach.

119. Defendants have engaged in a common course of conduct and Plaintiff and Class Members have been similarly impacted by Defendants' failure act reasonably in collecting and storing the Private Information and to maintain reasonable security procedures and practices to protect such information, as well as Defendants' failure to timely alert affected individuals to the Data Breach.

120. **Superiority: Federal Rule of Civil Procedure 23(b)(3).** This class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

121. **Injunctive Relief is Appropriate under Federal Rule of Civil Procedure 23(b)(2).** Defendants have failed to take actions to safeguard Plaintiff's and Class Members Private Information such that injunctive relief is appropriate and necessary. Defendants have acted on

grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

## COUNT I

**Negligence**
***(On Behalf of Plaintiff and the Class)***

122. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 121 above as though fully set forth herein.

123. Defendants obtained Plaintiff's and Class Members' Private Information for commercial gain. Defendant TriZetto collected and stored this Private Information for purposes of providing services to its clients and their patients.

124. Defendants owed Plaintiff and Class Members a duty to exercise reasonable care in protecting their Private Information from unauthorized disclosure or access.

125. Defendants owed a duty of care to Plaintiff and Class Members to provide adequate data security, consistent with industry standards, to ensure that their systems and networks adequately protected the Private Information.

126. Defendants' duty to use reasonable care in protecting Private Information arises as a result of their relationship as a healthcare and financial services company, common law and federal law, and their own statements regarding privacy and data security. Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices.

127. Given the sensitivity of the Plaintiff's and Class Members' Private Information that Defendants collected and stored, and given the history of data breaches against other entities in the healthcare and financial services sectors as described above, it was foreseeable that cybercriminals would attempt to hack Defendants' systems to obtain Plaintiff's and Class Members' Private

Information.

128. Defendants' duties included obligations to take reasonable steps in the management of the Private Information of Plaintiff and Class Members to prevent its disclosure and safeguard such information from theft. Defendants' duties included the responsibility to affirmatively design, implement, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

129. Defendants were aware of and embraced their duty to exercise reasonable care in handling the Private Information of Plaintiff and Class Members.

130. For example, on its websites, TriZetto touts that it "implements appropriate security measures designed to prevent unlawful or unauthorized processing of personal information…."[70]

131. Defendants were subject to an independent legal duty to exercise reasonable care in handling Plaintiff's and Class Members' Private Information, untethered to any contract between it and either Plaintiff or Class Members. In addition to the duties described above, the sources of Defendants' duties are those imposed by laws such as Section 5 of FTC Act and HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations..

132. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. 15 U.S.C. § 45(a)(1).

133. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

134. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures

[70]https://www.cognizant.com/us/en/privacy-notice

to protect Private Information and failing to comply with applicable industry standards, including but not limited to failing to protect against foreseeable security threats such as ransomware attacks. Defendants' conduct was unreasonable given the nature and amount of Private Information it obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiff and Class Members.

135. Defendants are entities covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

136. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Defendants had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

137. Specifically, HIPAA requires Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it created, received, maintained, or transmitted; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforces to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

138. HIPAA also requires Defendants to provide Plaintiff and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

139. Defendants violated HIPAA by actively disclosing Plaintiff's and Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; by failing to protect against

foreseeable security threats such as ransomware attacks; and by failing to provide Plaintiff and Class Members with adequate notification of the Data Breach within 60 days after its discovery.

140. Defendants knew, or should have known, of the risks inherent in collecting and storing Private Information in a centralized location, their vulnerability to ransomware and network attacks, and the importance of adequate security.

141. Defendants breached their duties to Plaintiff and Class Members in numerous ways, as described herein, including by:

a. Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiff and Class Members;

b. Failing to comply with industry standard data security measures leading up to the Data Breach;

c. Failing to protect against foreseeable security threats such as ransomware attacks;

d. Failing to comply with their own privacy policies and those of the entities for which it provided services;

e. Failing to comply with regulations protecting the Private Information at issue during the period of the Data Breach;

f. Failing to adequately monitor, evaluate, and ensure the security of their network and systems;

g. Failing to recognize in a timely manner that Private Information had been compromised; and

h. Failing to timely and adequately disclose the Data Breach.

142. Plaintiff's and Class Members' Private Information would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

143. Defendants' failure to take proper security measures to protect the sensitive Private Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of Private Information by unauthorized third parties. Given that entities in the healthcare and financial services industry are prime targets for hackers, Plaintiff and Class Members are part of a foreseeable, discernible group that was at high risk of having their Private Information misused or disclosed if not adequately protected by Defendants.

144. It was also foreseeable that Defendants' failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

145. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and

adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Defendants' data breach; (x) the loss of the benefit of the bargain for the failure of Defendants to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

146. Plaintiff and Class Members seek all available damages suffered as a result of Defendants' negligence, including compensatory, consequential, general, and/or nominal damages.

**COUNT II**

**Negligence *Per Se***
***(On Behalf of Plaintiff and the Class)***

147. Plaintiff repeats and realleges by every allegation set forth in Paragraphs 1 through 121 above as though fully set forth herein.

148. Section 5 of the FTC Act prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as TriZetto, for failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

149. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with industry standards, including but not limited to failing to protect against foreseeable security threats such as ransomware attacks. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of a data breach involving health and financial information.

150. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

151. The harm that has occurred as a result of TriZetto's conduct is the type of harm that the FTC Act was intended to guard against.

152. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

153. As a business associate and health plan, Defendants are entities covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

154. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq*., and its implementing regulations, Defendants had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

155. Specifically, HIPAA required Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

156. HIPAA also requires Defendants to provide Plaintiff and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400–414.

157. Defendants violated HIPAA by actively disclosing Plaintiff's and Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; by failing to protect against foreseeable security threats such as ransomware attacks; and by failing to provide Plaintiff and

Class Members with adequate notification of the Data Breach within 60 days after its discovery.

158. Plaintiff and Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients who have received medical treatment from one of Defendants' clients.

159. The harm that has occurred as a result of Defendants' conduct is the type of harm that HIPAA was intended to guard against.

160. Defendants' violation of HIPAA constitutes negligence *per se*.

161. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including those identified above.

162. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured as described herein and are entitled to damages in an amount to be proven at trial.

## COUNT III

**Unjust Enrichment**
***(On Behalf of Plaintiff and the Class)***

163. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 121 above as though fully set forth herein.

164. Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information about them that was conferred upon, collected by, used by, and maintained by Defendants and that was ultimately stolen in the Data Breach.

165. Plaintiff and Class Members procured healthcare and financial services from Defendants, and thereby conferred a benefit upon them in the form of monies they paid for these services. Plaintiff and Class Members also conferred their Private Information upon Defendants.

166. Defendants benefited by the conferral upon it of the Private Information pertaining

to Plaintiff and the Class Members and by their ability to retain, use, and profit from that information. Defendants understood and valued these benefits.

167. Defendants also understood and appreciated that the Private Information pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that Private Information.

168. Without Defendants' willingness and commitment to maintain the privacy and confidentiality of the Private Information, that Private Information would not have been transferred to and entrusted to Defendants. Further, if Defendants had disclosed that their data security measures were inadequate, Defendants would not have been permitted to continue in operation by regulators or their clients.

169. Because of Defendants' use of Plaintiff's and Class Members' Private Information, Defendants sold more services and products than they otherwise would have. Defendants were unjustly enriched by profiting from the additional services and products it was able to market, sell, and create to the detriment of Plaintiff and Class Members.

170. Defendants also benefitted through their unjust conduct by retaining money that they should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Members' Private Information, or to exercise sufficient oversight over the data security practices of their contractors.

171. Defendants also benefited through their unjust conduct in the form of the profits they gained through the use of Plaintiff's and Class Members' Private Information.

172. It is inequitable for Defendants to retain these benefits.

173. As a result of Defendants' wrongful conduct as alleged in this Complaint (including among other things their failure to employ and oversee adequate data security measures, their

continued maintenance and use of the Private Information belonging to Plaintiff and Class Members without having adequate data security measures, and their other conduct facilitating the theft of that Private Information), Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

174. Defendants' unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members' sensitive Private Information, while at the same time failing to ensure that information maintained was secure from intrusion and theft by hackers and identity thieves.

175. It is inequitable, unfair, and unjust for Defendants to retain these wrongfully obtained benefits. Defendants' retention of wrongfully obtained monies violates fundamental principles of justice, equity, and good conscience.

176. The benefits conferred upon, received, and enjoyed by Defendants were not conferred gratuitously, and it would be inequitable, unfair, and unjust for Defendants to retain the benefit.

177. Defendants' defective security and their unfair and deceptive conduct has, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their Private Information and has caused Plaintiff and Class Members other damages as described herein.

178. Plaintiff and Class Members have no adequate remedy at law because of Defendants' continuing inadequate security practices, and because their injuries include an imminent and ongoing risk of identity theft and fraud.

179. Defendants are therefore liable to Plaintiff and Class Members for restitution or disgorgement in the amount of the benefit conferred on Defendants as a result of their wrongful

conduct, including specifically: the value to Defendants of the Private Information that was stolen in the Data Breach; the profit Defendants received and are receiving from the use of that information; the amounts that Defendants overcharged Plaintiff and Class Members for use of their products and services; and the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' Private Information.

## COUNT IV

**Declaratory and Injunctive Relief**
***(On Behalf of Plaintiff and the Class)***

180. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 121 above as though fully set forth herein.

181. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant necessary further relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statute and state common law as described in this Amended Complaint.

182. Upon reason and belief, Defendants still possess the Private Information of Plaintiff and the Members of the Class. Further, Defendants still owe legal duties to adequately secure and protect the Private Information of Plaintiff and Members of the Class.

183. There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet their legal duties. For example, since the Data Breach, Defendants have not yet announced any specific changes to their data security infrastructure, processes or procedures to fix the vulnerabilities in their computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

184. An actual controversy has arisen in the wake of the Data Breach regarding the Private Information of Plaintiff and Class Members and whether Defendants are currently maintaining data security measures adequate to protect from further data breaches that compromise such Private Information. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their Private Information as it remains accessible on the and remain at imminent risk that further compromises of their Private Information will occur in the future.

185. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Private Information obtained from Plaintiff and Class Members and to timely notify such individuals of a data breach under the common law, Section 5 of the FTC Act and HIPAA;

b. Defendants breached and continue to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information; and

c. Defendants' breach of their legal duty continues to cause harm to Plaintiff and Class Members.

186. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols (and oversight of such protocols) consistent with law and industry standards to protect individuals' (i.e., those of Plaintiff and Class Members) Private Information.

187. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. In fact, now that TriZetto's

insufficient data security is known to hackers, the Private Information in TriZetto's possession is even more vulnerable to cyberattack. If another breach at Defendants occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

188. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a preexisting legal obligation to employ such measures.

189. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

## COUNT V

**Breach of Third-Party Beneficiary Contract**
***(On Behalf of Plaintiff and the Class)***

190. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 121 above as though fully set forth herein.

191. As a business associate that provides services to One Community and other healthcare entities, upon information and belief TriZetto enters into Business Associate Agreements with One Community and its other clients.

192. A Business Associate Agreement is a contract under HIPAA that is between a covered entity (such as a healthcare provider like One Community) and businesses (such as TriZetto) when that business performs certain functions on behalf of or provides a service to, the

covered entity that involves the creation maintenance or transmission of PHI.

193. A Business Associate Agreement establishes a business associate's permissible uses of PHI, hot the business associate will comply with HIPAA's Privacy Rule, and the responsibility of both the business associate and covered entity to maintain the privacy and security of PHI.

194. On information and belief, TriZetto entered into written contracts with One Community and others regarding the use of Plaintiff's and Class Members' Private Information for the provision of software services to assist in providing health insurance to Plaintiff and Class Members, including entering into Business Associate Agreements.

195. TriZetto agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class and to timely and adequately notify them of the Data Breach.

196. Plaintiff and Class Members are members of a class of people that the parties to the contracts intended to protect and benefit. Thus, Plaintiff and Class Members are third-party beneficiaries of such contracts.

197. Terms of compliance with HIPAA are expressly for the benefit of Plaintiff and the Class Members, as the statute is intended to protect the information of individual patients. Therefore, these contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendants. TriZetto knew that, if it were to breach these contracts, Plaintiff and Class Members would be harmed.

198. TriZetto breached the contracts it entered into with One Community and others by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate

protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately notifying Plaintiff and Class Members of the Data Breach.

199. As a direct and proximate result of TriZetto's breaches of contract, Plaintiff and Class Members have been injured and are entitled to damages (including but not limited to special, consequential, and nominal damages) in an amount to be proven at trial.

**COUNT VI**

**Breach of Fiduciary Duty**
**(*On Behalf of Plaintiff and the Class*)**

200. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 121 above as though fully set forth herein.

201. Plaintiff and Class Members have an interest, both equitable and legal, in their Private Information that was conveyed to, collected by, and maintained by Defendants and which was ultimately accessed or compromised in the Data Breach.

202. The Private Information of Plaintiff and Class Members was disclosed to Defendants. That Private Information is akin to the health information communicated to their medical providers when receiving medical care.

203. In order to receive services for healthcare, Plaintiff and Class Members had to disclose their Private Information to their healthcare providers (such as One Community), and ultimately (without their knowledge) to Defendants.

204. As the recipient of Plaintiff's and Class Members' Private Information, which was given to it in order to obtain healthcare, Defendants have a fiduciary relationship with Plaintiff and Class Members.

205. Defendants knew that Plaintiff and Class Members had to unknowingly entrust

their Private Information with them so that they could receive healthcare. Defendants therefore exercised a controlling influence over Plaintiff and Class Members as it related to the security of their Private Information.

206. Defendants voluntarily undertook this fiduciary duty by knowingly contracting with healthcare providers subject to HIPAA requirements, and as reflected in their representations that, among other things, their operations would be compliant with HIPAA and that they had sufficient safeguards to ensure data security.

207. Because of that fiduciary relationship, Defendants were provided with and stored Plaintiff's and Class Members' valuable Private Information. Plaintiff and Class Members expected their information to remain confidential while in Defendant's possession.

208. In light of the special relationship between Defendants and Plaintiff and Class Members, Defendants became a fiduciary by undertaking a guardianship of the Private Information to act for Plaintiff and Class Members for: (a) the safeguarding of the Private Information; (b) the providing of timely notice of a Data Breach regarding that Private Information; and (c) the maintenance of complete and accurate records regarding the storage, usage of, and access to the Private Information.

209. Defendants breached their fiduciary duty to Plaintiff and Class Members by not acting reasonably in collecting, storing, transmitting, and maintaining the Private Information; in failing to encrypt the Private Information; failing to protect the integrity of the systems containing Plaintiff's and Class Members' Private Information; in failing to provide timely and sufficient notice of a Data Breach regarding the Private Information; and by otherwise failing to safeguard Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.

210. Plaintiff and Class Members did not consent to nor authorize One Community (or

its contractor Defendants) to release or disclose their Private Information to unauthorized third parties or to cybercriminals.

211. As a direct and proximate result of Defendants conduct, Plaintiff and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the loss of the benefit of the bargain for the failure of TriZetto to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

212. Plaintiff and Class Members seek all available damages suffered as a result of Defendants' breach of their fiduciary duty, including compensatory, consequential, general, and/or nominal damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully request the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and Plaintiff's Counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

F. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial in the instant action.

Dated: March 24, 2026

Respectfully submitted,

*/s/ James E. Cecchi*

James E. Cecchi
Jason H. Alperstein
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road

Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

Norman E. Siegel #44378 (MO)*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

*Attorneys for Plaintiff Buser and the Proposed Class*

**pro hac vice forthcoming*